IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION



| | |
|---|---|
| UNITED STATES OF AMERICA | |
| *v.* | Criminal Information |
| JASON LARY | No. 1:21-CR-437 |

THE UNITED STATES ATTORNEY CHARGES THAT:

## COUNT 1
*(Wire Fraud)*

1.  Beginning on a date unknown, but from at least as early as May 2020 until in or about April 2021, in the Northern District of Georgia, defendant JASON LARY, aided and abetted by others known and unknown, knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property from recipients of COVID-19 relief funds, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material fact, caused to be transmitted by means of wire communications in interstate and foreign commerce, certain signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## Background

At all times relevant to this Information:

2.  The City of Stonecrest ("Stonecrest") was incorporated in 2016 and is a municipality in DeKalb County, Georgia with a population exceeding 59,000

people.  Since November 2016, defendant JASON LARY has been the Mayor of Stonecrest.

3.  In October 2017, Stonecrest passed a city ordinance adopting a Code of Ethics.  The Code of Ethics applied to LARY as mayor and other Stonecrest elected officials and employees.  The Code of Ethics provided that it was the policy of Stonecrest that "public office not be used for personal gain; and that the public have confidence in the integrity of its government."  The Code of Ethics further provided as a standard of conduct that "[a]ll public funds shall be used for the general welfare of the people and not for personal economic gain."  The ordinance establishing the Code of Ethics was signed by LARY.

### COVID-19 Pandemic and CARES Act Relief Funds

4.  On March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act into law in response to the economic fallout of the COVID-19 pandemic in the United States.  It was a part of the CARES Act that federal relief funds ("Relief Funds") were disbursed directly to Americans, federal agencies, and state and local governments.

5.  In April 2020, the federal government disbursed to DeKalb County approximately $125 million in Relief Funds to assist county citizens who were impacted by COVID-19.  The federal government permitted DeKalb County to further disburse the Relief Funds to its municipalities and, at least as early as May 21, 2020, the CEO of DeKalb County publicly discussed in a virtual meeting that DeKalb County was planning to provide Relief Funds to its municipalities.  LARY attended this virtual meeting.

6.  On or about July 14, 2020, the DeKalb County Board of Commissioners voted to grant a portion of the Relief Funds to its municipalities, including Stonecrest.  Accordingly, on or about August 10, 2020, DeKalb County executed an intergovernmental contract with Stonecrest for an approximately $6.2 million grant of Relief Funds.

7.  In general, the intergovernmental contract required Stonecrest to spend the Relief Funds in accordance with CARES Act guidance from the United States Department of the Treasury, which included a requirement that Relief Funds "only be used to cover costs that – [were] necessary expenditures incurred due to the public health emergency . . . . and were incurred during the period that [began] on March 1, 2020, and [ended] on December 30, 2020."   The guidance from the Department of the Treasury further clarified the permissible use of Relief Funds, including, for example:

    a.  Expenditures were incurred "due to" the coronavirus pandemic if they were "used for actions taken to respond to the public health emergency," which included "second-order effects . . . such as providing economic support to those suffering from employment or business interruptions due to COVID-19-related business closures."

    b.  Examples of eligible expenditures were: "[m]edical expenses," "[p]ublic health expenses," "[p]ayroll expenses for public safety, public health, health care, human services, and similar employees . . . substantially dedicated to mitigating or responding to the COVID-19 public health emergency," and

3

"grants to small businesses to reimburse the costs of business interruption caused by required closures."

      c.  Costs were considered "incurred during the period that [began] on March 1, 2020, and [ended] on December 30, 2020" if "performance or delivery must occur during the covered period . . . ."

      d.  Relief Funds could be used to remarket a recipient's convention facilities and tourism industry, "if the costs of such remarketing satisfy the requirements of the CARES Act.  Expenses incurred to publicize the resumption of activities and steps taken to ensure a safe experience may be needed due to the public health emergency.  Expenses related to developing a long-term plan to reposition a recipient's convention and tourism industry and infrastructure would not be incurred due to the public health emergency and therefore may not be covered using [Relief Funds]."

    8.  On or about September 28, 2020, LARY, in his capacity as Mayor of Stonecrest, signed a resolution concerning Stonecrest's distribution of the approximately $6.2 million of Relief Funds.  The resolution acknowledged that the CARES Act required that Relief Funds be spent "to cover necessary expenditures incurred . . . due to the healthcare emergency that were not accounted for as part of the local government budget and that were expended during the healthcare emergency[.]"  The resolution outlined a funding plan for the Relief Funds, which included the following:

      a.  One million dollars for the Stonecrest Cares Program for "mask distribution, COVID-19 education, COVID-19 testing [and] evaluation, new

4

initiatives and administrative oversight[.]"  In practice, the Stonecrest Cares
Program disbursed Relief Funds to churches and non-profit organizations in and
around Stonecrest.

      b. Five million dollars for the COVID-19 CARES [Act] Small Business
Program ("Small Business Program").  The resolution described several
requirements for the Small Business Program, including having a program
administrator to "develop [an] application," "receive applications and vet
candidates," and "develop [a] protocol for [the] disbursement of funds . . . and
[an] audit process . . . ."

9.  In or about November 2020, Stonecrest published an application on its
website for businesses to apply for Relief Funds through the Small Business
Program.  Among other things, the application asked, "Are you willing to
allocate 25% of your grant to marketing your business?"  Over 400 businesses
applied for Relief Funds through the website.  Stonecrest approved fewer than
150 of the applicants for Relief Funds grants.

<u>**Municipal Resource Partners Corporation, Inc.**</u>

10.  Stonecrest did not directly distribute the $6 million of Relief Funds that
funded the Stonecrest Cares Program and Small Business Program.  Rather, it
contracted with a private company called Municipal Resource Partners
Corporation, Inc. ("MRPC") to disburse these Relief Funds.  In particular, the
contract required MRPC to: (a) open bank accounts to receive the Relief Funds,
(b) provide an accounting of Relief Funds received and disbursed, and
(c) disburse the Relief Funds as directed by Stonecrest.  The contract was not

presented to or approved by the City Attorney or City Council, and it was not subject to open bidding.

11.  Stonecrest transferred $6 million in Relief Funds to an MRPC bank account.  Thereafter, from in or about November 2020 through in or about February 2021, MRPC disbursed substantially all of the Relief Funds to individuals, businesses (pursuant to the Small Business Program), churches and non-profit organizations (pursuant to the Stonecrest Cares Program), and other expenditures.

## Purpose of the Scheme to Defraud

12.  Abusing the power and authority conferred on him as Mayor of Stonecrest, LARY knowingly devised, intended to devise, and participated in a scheme and artifice to defraud whose object was to steal Relief Funds after they were granted to businesses and churches using materially false and fraudulent pretenses, representations, and omissions of material fact.  More specifically:

a.  LARY falsely represented to businesses and churches that they were required to contribute a portion of their Relief Funds to entities identified by LARY.  LARY did not tell the businesses and churches that he controlled and had a financial interest in these entities.

b.  LARY falsely represented that the required contributions of Relief Funds would be used to benefit the citizens of Stonecrest.  In truth, as LARY well knew, the contributions were intended to benefit – and did benefit –  only LARY and those of his choosing.

13.  It was also part of the scheme and artifice to defraud that LARY concealed and attempted to conceal the scheme by publicly stating that no Relief Funds had been stolen, and by creating the false appearance that the entities used by LARY to execute the scheme were legitimate.

### Manner and Means

14.  In total, LARY and others acting on his behalf defrauded Relief Funds recipients out of more than $650,000.  The manner and means by which LARY carried out the scheme to defraud included, but were not limited to, the following:

a.  In or about May 2020, LARY helped establish Visit Us, Inc. ("Visit Us") a non-profit corporation.  LARY led others to believe that the purpose of Visit Us was to promote tourism in Stonecrest.  In truth, the function of Visit Us was to receive the proceeds of LARY's fraud scheme – *i.e.,* stolen Relief Funds.

b.  On or about October 19, 2020, Articles of Organization were filed with the Georgia Secretary of State for Battleground Media, LLC ("Battleground Media").  No records submitted to the Georgia Secretary of State identify any officers of the company; however, Battleground Media was controlled by LARY, and its function was to receive the proceeds of LARY's fraud scheme.

c.  On or about October 22, 2020, Articles of Organization were filed with the Georgia Secretary of State for Real Estate Management Consultants, LLC ("REMC").  No records submitted to the Georgia Secretary of State identify any officers of the company; however, REMC was controlled by LARY, and its function was to receive the proceeds of LARY's fraud scheme.

    d.  After Relief Funds were given to grant recipients, LARY and others acting on his behalf approached businesses and churches directing that a portion of their Relief Funds be transferred to Visit Us, Battleground Media, and REMC.

    e.  In most cases, when soliciting Relief Funds from businesses, LARY and others acting on his behalf falsely stated that the Relief Funds for Visit Us and Battleground Media would be used for Stonecrest-related marketing or advertising.  By way of example only:

    i.  In or about December 2020, "Company 1" applied for Relief Funds at LARY's invitation and were approved for a $50,000 grant from the Small Business Program.  Subsequently, LARY met in person with G.W., an employee of Company 1, seeking a 25% contribution of its Relief Funds for Visit Us, which LARY falsely claimed was intended for marketing.  On or about January 22, 2021, Company 1 issued a check for $12,500 (25% of its Relief Funds award) for Visit Us and gave it to an associate of LARY's.  Stolen Relief Funds in Visit Us' account were used for LARY's own purposes, including to fund political advertising of an associate and to pay for another person's college tuition.

    ii.  In or about December 2020, "Company 2" applied for Relief Funds at LARY's invitation and were approved for a $50,000 grant from the Small Business Program, even though Company 2 only applied for $25,000. Subsequently, LARY met in person with D.B., an owner of Company 2, seeking a 25% contribution of its Relief Funds for Battleground Media, which LARY falsely claimed was intended for advertising.  On or about December 21, 2020, Company

2 issued a check for $12,500 (25% of its Relief Funds award) for Battleground Media and gave it to LARY.

   f. When soliciting Relief Funds from churches, LARY and others acting on his behalf falsely stated that the Relief Funds for REMC would be used for home repair and rent support to those impacted by the COVID-19 pandemic.  By way of example only:

    i. On or about November 12, 2020, LARY presented a $150,000 Relief Funds check to "Church 1." In presenting the check, LARY stated, in sum and substance, that the church had to allocate $50,000 of the Relief Funds to REMC.  LARY falsely stated that the money given to REMC would be spent to assist with home repairs for people who could not afford the repairs due to COVID-19.  In truth, REMC did not use the money for the purpose stated by LARY.  The money was used to benefit LARY, including by paying his federal, state and local tax liabilities.

    ii. On or about December 23, 2020, LARY presented a $50,000 Relief Funds check to "Church 2." After presenting the check, LARY caused another person to request, in sum and substance, that Church 2 contribute $4,500 of the Relief Funds to REMC to provide rent assistance.  REMC did not use the money for the stated purpose.  The money was used to benefit LARY, including to pay for LARY's property expenses and dues to the Georgia Campaign Finance Commission.

## Execution of the Scheme to Defraud

15. On or about the date set forth below, defendant JASON LARY, for the purpose of executing and attempting to execute the scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, did, with intent to defraud, cause to be transmitted by means of wire communications in interstate and foreign commerce certain writings, signs, and signals – that is: the electronic transmission set forth below:

| Count | Date | Amount | Entity | Description |
|-------|------|--------|--------|-------------|
| 1 | 11/23/2020 | $47,500 | Church 1 | Relief Funds check written to REMC, purportedly for COVID-19 related home repair assistance, and deposited into Bank of America account ending in 5651. |

All in violation of Title 18, United States Code, Section 1343 and Section 2.

## COUNT 2
*(Conspiracy)*

16. The U.S. Attorney re-alleges and incorporates by reference the factual allegations from Paragraphs 1 through 15 of this Information as if fully set forth here.

17. Beginning on a date unknown, but at least from in or about September 2020 until on or about January 22, 2021, in the Northern District of Georgia, defendant JASON LARY knowingly and willfully combined, conspired, confederated, agreed, and had a tacit understanding with Lania Boone to commit an offense against the United States; to wit, to embezzle, steal, obtain by fraud,

and otherwise without authority knowingly convert to the use of any person other than the rightful owner and intentionally misapply property that is valued at least at $5,000, which was under the care, custody, and control of an organization, government, and agency that receives, in any one-year period, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, while being an agent of such organization, government, and agency, in violation of Title 18, United States Code, Section 666(a)(1)(A).

## Manner and Means

18.  The manner and means by which the conspiracy to commit federal program theft was sought to be accomplished included, but was not limited to, the following:

a.  In or about September 2020, LARY caused the CEO of MRPC to retain the services of Lania Boone to control MRPC's bank accounts and the disbursement of Relief Funds in the custody of MRPC.

b.  On or about October 15, 2020, the CEO of MRPC and Boone, accompanied by LARY, jointly opened accounts at Bank of America in MRPC's name to receive the Relief Funds.  On or about November 18, 2020, Boone alone opened two more accounts at Bank of America in MRPC's name, including an account ending in 4047 (the "4047 Account").  The CEO of MRPC was unaware Boone had opened the 4047 Account.  Boone had access and control over the 4047 Account, including its online banking features.

11

c.  In or around November 2020, LARY, in his capacity as Mayor of Stonecrest, ensured that MRPC received the contract to disburse the $6 million of Relief Funds received from the federal government.

d.  After the $6 million of Relief Funds was transferred by Stonecrest to an MRPC bank account at Bank of America, some of the Relief Funds were subsequently transferred to the 4047 Account controlled by Boone.

e.  Instead of disbursing all the Relief Funds for purposes authorized by the CARES Act, LARY and Boone conspired to embezzle and steal a portion of the Relief Funds in MRPC's custody in order to pay off the mortgage on a lakefront home owned by LARY.  In exchange, LARY provided a financial benefit to Boone; to wit, using stolen Relief Funds held in a Visit Us bank account to pay for Boone's child's college expenses.

### Overt Acts

19.  In furtherance of the conspiracy to commit federal program theft, LARY and Boone committed at least the following overt acts in the Northern District of Georgia:

a.  On or about December 22, 2020, LARY called "Servicing Company A," a mortgage servicing and originating company, to request instructions for a pay-off of the existing mortgage on his lakefront home.

b.  On or about January 12, 2021, LARY called Servicing Company A to again request pay-off instructions.  This time, LARY asked for the pay-off instructions to be emailed to LARY's personal account and to Boone's personal account.

c.  On or about January 12, 2021, two checks were written by Visit Us at LARY's direction.  The first check was payable to a university in the amount of $5,657.47.  The check's memo line stated the payment was for Boone's child's "Meal Plan, Tuition & Books."  The second check was payable to an individual in the amount of $2,000.00.  The check's memo line stated the payment was for Boone's child's "Rent (2/2021-5/2021)."

d.  On or about January 21, 2021, Boone's personal email account received an email from Servicing Company A that attached a pay-off statement for LARY's lakefront home.  The pay-off statement listed the total price to extinguish the mortgage as $108,137.48 plus an additional $18.04 in interest per day if the funds were received on or after January 22, 2021.

e.  On or about January 22, 2021, Boone initiated a wire transfer in the amount of $108,155.52 (the pay-off price plus one day of interest), which were Relief Funds, from the 4047 Account to a bank account held by Servicing Company A.  Boone included the instruction "PAYOFF EDGEWATER DRIVE" on the wire transfer, which is the street name of LARY's lakefront home. The wire payment extinguished the mortgage on the home, resulting in LARY owning it free of any debt.

All in violation of Title 18, United States Code, Section 371.

13

## COUNT 3
*(Federal Program Theft)*

20.  The U.S. Attorney re-alleges and incorporates by reference the factual allegations from Paragraphs 1 through 19 of this Information as if fully set forth here.

21.  From at least as early as June 2020 and continuing through May 2021, in the Northern District of Georgia and elsewhere, defendant JASON LARY, being an agent of the City of Stonecrest government, aided and abetted by others known and unknown, embezzled, stole, obtained by fraud, and otherwise without authority knowingly converted to the use of any person other than the rightful owner and intentionally misapplied property that is valued at least at $5,000, which was under the care, custody, and control of an organization, government, and agency that receives, in any one-year period, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, while being an agent of such organization, government, and agency, in violation of Title 18, United States Code, Section 666(a)(1)(A) and Section 2.

*[Intentionally left blank]*

## FORFEITURE PROVISIONS

21.  Upon conviction of one of more of the offense alleged in Counts One through Three of the Criminal Information, defendant JASON LARY shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real or personal, constituting and derived from proceeds traceable to the offense, including but not limited to the following:

- $355,674.92 seized from Bank of America ("BOA") account xxxx xxxx 3831 in the name Visit Us, Inc. on or about September 22, 2021;
- All funds maintained in BOA account xxxx xxxx 3856 in the name of Visit Us, Inc.;
- $132,967.39 seized from BOA account xxxx xxxx 4811 in the name of Battleground Media, LLC on or about September 22, 2021;
- All funds maintained in BOA account xxxx xxxx 4845 in the name of Battleground Media, LLC; and
- A MONEY JUDGMENT: A sum of money in United States currency equal to the amount of proceeds the defendant obtained as a result of the offense for which the defendant is convicted.

22.  If, as a result of any act or omission of the defendant, any property subject to forfeiture:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

15

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided

without difficulty; the United States intends, pursuant to Title 21, United

States Code, Section 853(p), as incorporated by Title 18, United States Code,

Section 982(b), to seek forfeiture of any other property of the defendant up to

the value of the forfeitable property.


KURT R. ERSKINE
*Acting United States Attorney*


TREVOR C. WILMOT
*Assistant United States Attorney*
Georgia Bar No. 936961
600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

16