IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JASON LARY | Criminal Action No.<br><br>1:21-CR-437-TWT |

### The United States' Sentencing Memo

The United States of America, by Ryan K. Buchanan, United States Attorney, and Trevor C. Wilmot, Assistant United States Attorney for the Northern District of Georgia, files this Sentencing Memorandum to address Mr. Lary's objections to various guidelines enhancements, narrow the restitution dispute, and provide the Government's sentencing recommendation.

**1.  Mr. Lary's guidelines objections should mostly be overruled.**

Mr. Lary objects to the guidelines enhancements for 10+ victims/mass-marketing (+2), sophisticated means (+2), abuse of a position of trust (+2), and aggravated role in the offense (+4).  *See* PSR at ¶¶ 69-73.  Mr. Lary concedes, however, that a two-level enhancement for aggravated role is appropriate.  *Id*. at ¶ 73.  The Government stipulates to Mr. Lary's admission of a two-level role enhancement because the evidence presently supports that Mr. Lary organized and led a criminal network that did not number five or more participants. *See* U.S.S.G. §§ 3B1.1(a) (a four-level enhancement applies if there are five or more participants), 3B1.1(c) (a two-level enhancement applies if there are less

than five participants), and cmt. 1 (a "participant" must be criminally responsible for the offense).[1]

As to the remaining guidelines objections, the Government bears the burden of proving their applicability by a preponderance of the evidence. *United States v. Victor*, 719 F.3d 1288, 1290 (11th Cir. 2013). The preponderance standard is not a difficult one, and simply requires proof that the existence of a fact is more probable than its nonexistence. *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012); *United States v. Fuentes*, 107 F.3d 1515, 1531 (11th Cir. 1997) (equating preponderance standard with "more-likely-than-not" standard of review for purposes of restitution issues at criminal sentencing). In other words, weighing "the evidence favoring [the Government] and the evidence favoring [the Defendant] on opposite sides of balancing scales, [the Government] needs to make the scales tip to [its] side." Eleventh Circuit Pattern Jury Instructions (Civil) 2013, at 1.1. In making this inquiry, "[a]ny information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3, Commentary. This includes un-objected to or admitted portions of the PSR. *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004); *see also United States v. Aguilar-Ibarra*, 740 F.3d 587, 592 (11th Cir. 2014) ("a defendant is deemed to have admitted any such statements that he has not

---

[1] While the PSR identifies four participants in addition to Mr. Lary, the investigation does not support concluding that one of those individuals was criminally responsible for his involvement. *Compare* PSR at ¶ 73 (identifying four participants) *with id*. at ¶ 58-59 (describing the limited conduct of one of those people in opening a bank account for Mr. Lary).

objected to with specificity and clarity"). The Court may even rely on conclusory statements in the PSR if the defendant fails to object to them. *United States v. Beckles*, 565 F.3d 832, 844 (11th Cir. 2009).

Mr. Lary did not object to any of the factual findings in the PSR, which are, therefore, deemed admitted. *See id*.[2] As shown below, the Court should overrule Mr. Lary's guidelines objections and find that the correct advisory guidelines range is 63-78 months' imprisonment.

**A. There were more than ten victims of the offense and it was committed through mass-marketing. Each aspect, standing alone, supports a two-level enhancement.**

U.S.S.G. § 2B1.1(b)(2)(A) provides for a two-level enhancement if the offense "(i) involved 10 or more victims; [or] (ii) was committed through mass-marketing . . . ." A company can be a victim under this enhancement provided it sustained "any part of the actual loss . . . ." U.S.S.G. § 2B1.1 cmt. 1. The application notes define mass-marketing as "a plan . . . or campaign that is conducted through solicitation by . . . the Internet, or other means to induce a large number of persons to (i) purchase goods or services . . . or (iii) invest for financial profit." *Id*. at cmt. 4(A).

---

[2] Mr. Lary did not object to $850,905.52 of loss in the initial PSR. The Government contends the loss should be $924,405.52 because some transactions were excluded from the initial loss calculation. *See* PSR at ¶ 62. The probation officer preserved an objection for Mr. Lary on loss, but the roughly $75,000 difference is irrelevant to the guidelines calculations in any event. *See id*.

There were easily more than ten companies that sustained an actual loss by giving a portion of their grants to Visit Us and Battleground Media under the false pretenses that the funds would be used for marketing or advertising their businesses. *See* PSR at ¶¶ 35-42 (examples of "marketing" contributions being sought from grantees), and 51, 53, 54 (charts identifying some of the businesses that gave up portions of their grants because of the fraud scheme). In reality, the funds deposited into the Visit Us and Battleground Media accounts were used and intended to be used to benefit Mr. Lary and others. *See, e.g.*, PSR at ¶2 (k)(ii), 33-42. For this reason alone, the Court should apply the enhancement.

It is also sufficient that the offense "was committed through mass-marketing" because the scheme used the Internet to solicit Small Business Program applicants that could be victimized. *See* U.S.S.G. § 2B1.1(b)(2)(A), cmt. 4(A). Specifically, the 25% marketing question on the grant application – which was published on Stonecrest's webpage and completed by the hundreds of businesses that applied for funds – set the stage for the fraud scheme by (a) suggesting to applicants that they had to answer "yes" to qualify for relief funds, (b) identifying a group of companies that could be approached for so-called "marketing" contributions, and (c) lending a veneer of legitimacy to the subsequent requests for contributions to Visit Us and Battleground Media. *See* PSR at ¶¶ 33-42.

### B. Mr. Lary used sophisticated means to commit the offense.

U.S.S.G. § 2B1.1(b)(10)(C) provides for a two-level enhancement if the offense "involved sophisticated means and the defendant intentionally engaged in or

4

caused the conduct constituting sophisticated means[.]" The application notes explain that the enhancement covers especially complex or intricate conduct in the execution or concealment of the offense. U.S.S.G. § 2B1.1 cmt. 9(B). Examples of qualifying conduct include, "hiding assets or transactions, or both, through the use of fictitious entities . . . ." *Id.*; *see United States v. Clarke*, 562 F.3d 1158, 1165-66 (11th Cir. 2009) (the examples listed in the application notes are not limiting, and "[f]or purposes of the sophisticated means enhancement, we see no material difference between concealing income and transactions through the use of third-party accounts . . . and using a corporate shell or a fictitious entity to hide assets"). The Court must look to the totality of the Defendant's conduct to determine sophistication; there is no requirement that every step taken was sophisticated. *United States v. Feaster*, 798 F.3d 1374, 1379-82 (11th Cir. 2015).

Mr. Lary's offense is a textbook example of sophisticated means because its success hinged on the use of front companies and concealed transactions. In the months leading up to the execution of the offense, Mr. Lary established Visit Us, Battleground Media, and REMC as fronts to receive fraud proceeds. PSR at ¶¶ 18-25. He was involved in the forming of MRPC, helped it open bank accounts, and ensured it would win the contract to disburse Stonecrest's relief funds, thereby removing the funds from direct city oversight. *Id.* at ¶¶ 11-14. He placed his co-conspirator, Mrs. Boone, into a position where she controlled the relief funds at MRPC, and he was able to direct her how to disburse funds in exchange for giving her a small share of the fraud proceeds. *Id.* at ¶¶ 12, 26-31.

Beyond preparing the offense, its execution further disguised its criminal nature. As shown above, Mr. Lary (and others) solicited funds for Visit Us and Battleground Media under a facially plausible claim of soliciting agreed to marketing contributions. *Id.* at ¶¶ 35-42. Similarly, Mr. Lary used REMC and churches as conduits to pay himself. *See Clarke*, 562 F.3d at 1165-66. For example, Mr. Lary misled "Church 1" into giving $50,000 to REMC – which he did not mention he controlled – for purportedly charitable use. PSR at ¶¶ 45-46. In reality, Mr. Lary used the REMC money for himself, including to maintain his real estate holdings, and, after transferring funds to another company, using that money to pay off his tax liabilities. *Id.* at ¶ 47.

Put differently, the sophistication is apparent from the point of view of the City and the churches: the first would see only a relief funds payment to a church, and the second would see only a relief funds payment to a company for a purportedly charitable undertaking. Why would either question their validity?

**C. The enhancement for abuse of a position of trust applies.**

U.S.S.G. § 3B1.3 provides for a two-level enhancement if the defendant "abused a position of public trust . . . in a manner that significantly facilitated the commission of concealment of the offense[.]" The enhancement applies when the position of public trust "contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult)." U.S.S.G. § 3B1.3 cmt. 1.

Mr. Lary's position as Mayor of Stonecrest contributed significantly to executing his fraud scheme. But for his position of as head of the Stonecrest's government, he could not have steered the relief funds to MRPC through a no-bid contract. *See* PSR at ¶¶ 12, 14. Sending the funds to MRPC in turn allowed Mr. Lary to steal $108,000 of relief funds to pay off the mortgage on his lakefront home in Macon. *Id*. at ¶ 26. Similarly, the public office and apparent authority conferred on Mr. Lary unquestionably led relief fund grantees to presume that Mr. Lary's requests for payments to entities such as Visit Us, Battleground Media, and REMC were legitimate and appropriate under the CARES Act.

**2. Lary owes restitution in the amount of $119,607.69.**

Where as here a defendant disputes restitution, the Government has the burden of establishing it by a preponderance of the evidence. 18 U.S.C. § 3664(e); *see* PSR at ¶ 64. In determining the correct restitution, the Court may consider hearsay evidence that bears "minimal indicia of reliability," so long as the defendant has the chance to refute it. *United States v. Rodriguez*, 751, F.3d 1244, 1261 (11th Cir. 2014). The Government initially calculated – after deducting from the actual loss amount those funds that were (a) seized and forfeited, and (b) returned to victims of the offense – that Mr. Lary owes restitution in the amount of $132,107.69. PSR at ¶ 64. In response, Mr. Lary asserted that this figure is "not entirely correct," and he attached an exhibit in which he contended that $46,750 should be further reduced from the Government's calculation. *See id*. and Defense "Exhibit A." The transactions itemized on the exhibit, therefore, capture the full scope of the restitution dispute.

7

The Government agrees with Mr. Lary only to the extent that the exhibit substantiates that $12,500 was returned to an offense victim from a Battleground Media account before the Government seized the funds in that account. Reducing the amount from the Government's initial calculation, the Government submits that Mr. Lary owes $119,607.69 in restitution.

There is no merit to the remaining restitution offsets claimed by Mr. Lary, as the claims involve money that either did not apply toward restitution in the first instance or was used to benefit Mr. Lary:

- $18,750 for a grantee-company "ITD." The investigation showed that Mr. Lary tried but failed to defraud ITD into contributing the money to Visit Us. PSR at ¶ 36. Because the effort failed, the money was never incorporated into the actual loss amount attributable to Visit Us in the first place. See PSR at ¶ 62 (counting only actual deposits toward loss).
- $6,500 for a grantee-church "FRCC." Mr. Lary states the amount was used to pay another company for a new roof. Mr. Lary neglects to mention, however, that the roof in question was installed on a property that he owned. See PSR at ¶ 50. In other words, Mr. Lary used an unwitting third party to steal funds to improve a personal asset.
- $4,500 for a grantee-church "NCCM." Mr. Lary states the funds were used to provide rent assistance, but the money was deposited into an REMC bank account under his control. See id. at ¶ 48. Indeed, NCCM was given a list of people whose rent would supposedly have been paid using these funds, and each person's amount due. But the REMC bank account does

not show any withdrawals in corresponding names or amounts. Further, the investigation showed that one person on the list was actually a tenant of a property owned by Mr. Lary.

- $3,500 and $1,500 for "[h]ome repair." The funds were deposited into Mr. Lary's REMC account and later withdrawals in corresponding amounts show the funds were spent to improve properties owned by Mr. Lary.

In sum, the Court should order Mr. Lary to pay $119,607.69 in restitution to the City of Stonecrest, which Mr. Lary deprived of the right to administer the stolen and unrecovered relief funds.[3]

### 3. The Government will recommend a one-level downward variance at sentencing.

Consistent with its obligations under the plea agreement, *see* Doc. 13-1 at 11, the Government will recommend that the Court vary downward by one offense level, resulting in a total adjusted offense level of 25, and an advisory guidelines range of 57-71 months' imprisonment. The Government's recommendation is based on Mr. Lary's history and characteristics, and in consideration of and based on information provided by him concerning his medical condition. *See id.*

---

[3] The Government understands that on the date of sentencing Mr. Lary will have prepaid approximately $46,000 toward his restitution. The prepayments, of course, have no bearing on the amount of restitution that should be ordered by Court; they simply lower the balance due and payable.

**4. Mr. Lary deserves to serve a lengthy term of imprisonment.**

Considering the sentencing factors in 18 U.S.C. § 3553(a), the Government recommends that the Court sentence Mr. Lary to a term of imprisonment within the lower third of the advisory guidelines range. The nature and circumstances of Mr. Lary's offense are shocking and shameless. Mr. Lary engineered this scheme shortly after learning that federal relief funds would find their way to Stonecrest's coffers. He ensured the funds would be shielded from public oversight and stay under his unfettered control by causing them to be sent to MRPC for further disbursement by Mrs. Boone. And he established three front companies to receive the scheme's proceeds, taking care to keep his name off company records (apart from bank accounts).

Despite knowing full well that the CARES Act – and basic principles of decency – required the funds to be spent to alleviate the harm inflicted by COVID-19, Mr. Lary disregarded the needs of his community and exploited his elected office for personal profit. The scheme's arms reached every part of the disbursement process. First, Mr. Lary stole funds directly from MRPC by having Mrs. Boone wire about $108,000 to payoff the mortgage on his lakefront property in Macon. Second, Mr. Lary, understanding that the pump was primed because of the 25% marketing question on the Small Business Program application, caused dozens of these companies to needlessly part with some of their grants for future "marketing" efforts. There was never such an undertaking; it was a fraud. Third, Mr. Lary preyed upon the trust placed in him by churches that received money through the Stonecrest Cares Program by directing payments to

REMC.  The churches thought they were contributing to worthy causes, but they were contributing only to the cause of improving Mr. Lary's finances.

Mr. Lary's relevant conduct did not end with relief funds.  In a bizarre extension of his criminal scheme, he also perpetrated a doomed effort to steal $100,000 from the Stonecrest Housing Authority ("SHA") by creating yet another front company, this one based in Nevada and called "MRPC, Inc."  The entire purpose of this undertaking was to mislead the SHA into believing that a $100,000 check Mr. Lary withdrew against an SHA account for MRPC, Inc. was a legitimate marketing expense, as the SHA had previously considered contracting with MRPC (the Georgia company) to perform, again, marketing.  Although the theft was quickly discovered – causing Mr. Lary to return the funds – the episode speaks to Mr. Lary's ongoing criminal state of mind, and his willingness to use his position to pad his bank account any which way he could.

All of this points toward a simple and unsettling conclusion.  Facing perhaps the most serious economic and social disruption in a generation, the citizens of Stonecrest deserved a dependable and honest Mayor.  What they got instead was a crook who stumbled into holding responsibility for overseeing the disbursement of millions of dollars in federal aid, and seized as much as he could for himself.   A term of imprisonment will, therefore, promote respect for the law and justly punish Mr. Lary's offense.

Imprisonment will also promote general deterrence.  "General deterrence is more apt, not less apt, in white collar crime cases."  *United States v. Howard*, 2022 U.S. App. LEXIS 5960, at *64-65 _ F.4th _ (11th Cir. 2022).  "[T]he Congress that

11

adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might not themselves be unlikely to commit another offense[.]" *Id*. at *64 (citing *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) (collecting cases where non-incarceration sentences in white collar cases were found to be substantively unreasonable)). The Eleventh Circuit has reasoned that this makes sense because "fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity." *Kuhlman*, 771 F.3d at 1329. These principles applied to the facts of the case favor imprisoning Mr. Lary.

By comparison, a sentence of home confinement Mr. Lary seeks, Doc. 27-1, would accomplish the opposite of general deterrence. Potential fraudsters instead would conclude that there are not serious consequences to getting caught if, like Mr. Lary, they can point to a lack of a criminal record and an ability to pay restitution. *See Martin*, 455 F.3d at 1240 (white collar criminals "often calculate the financial gain and risk of loss," and could conclude that a lenient sentence means they "stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty").

The mitigation offered by Mr. Lary does not establish the reasonableness of a non-custodial sentence. For example, he attaches to his sentencing memorandum a statistical survey to support his request for home confinement, *see* Doc. 27-6 (citing Exhibit 4), but the findings cut sharply against Mr. Lary's requested sentence. The survey purports to have examined sentences imposed

nationally over a roughly twenty-year period that involved defendants with the same offense level exposure as Mr. Lary claims applies (*i.e.*, +7 levels for loss, +2 levels for role, and -3 three levels for acceptance). *See* Doc. 27 at Exhibit 4, pages 2, 27-28. The survey finds that there were 10 so-situated defendants sentenced in the Eleventh Circuit, including four in this Court. *See id*. at pages 27-28. Of the Circuit-level comparators, all were sentenced to a term of imprisonment, the average being 31.4 months. *Id*. at 28. Of the Court-level comparators, all were sentenced to a term of imprisonment, the average being 30.8 months. *Id*. These findings demonstrate that someone in Mr. Lary's position – as he sees it – has simply not received a sentence of less than years of imprisonment. *See id*. If the Court grants the Government's position on contested guidelines, the correct offense level would be even higher than Mr. Lary claims, making even a 30-month sentence appear too lenient a result.

Mr. Lary's other arguments are also unavailing. Mr. Lary points, for example, to his age, medical condition, and community service as grounds for a substantial downward variance from the guidelines range. *See* Doc. 27-1-5. But the Government already has considered these factors in recommending a one-level downward variance. *See* Doc. 13-1 at 11. Mr. Lary next argues that he is not a recidivism risk. Doc. 27- 5 and Exs. 2-3 (collecting more than ninety pages of reports concerning the intersection of recidivism, age, and criminal history). But the Government does not argue that Mr. Lary is a likely recidivist; even so, a guidelines sentence of imprisonment is still appropriate considering the other sentencing factors. Mr. Lary further contends that the amount of public

humiliation and isolation he has endured should inure to his benefit at sentencing. *Id*. at 6.  Yet the stigma of a criminal conviction and enduring humiliation are not recognized sentencing factors.  If anything, the prospect of public embarrassment (to say nothing of the possible loss of liberty) would dissuade one from a criminal undertaking in the first place.  And surely Mr. Lary weighed the potential consequences of getting caught - he still decided to commit his crimes.  He must now pay the consequences for them.

## 5. Conclusion

The Court should find that the guidelines range is 57-71 months' imprisonment, sentence Mr. Lary to a term of imprisonment in the lower third of that range, and order restitution in the amount of $119,607.69.

Respectfully submitted,

RYAN K. BUCHANAN
*United States Attorney*

/s/TREVOR C. WILMOT
*Assistant United States Attorney*
Georgia Bar No. 936961
trevor.wilmot@usdoj.gov

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000  *fax* (404) 581-6181

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

        Dwight Thomas, Esq.

July 11, 2022

        /s/ TREVOR C. WILMOT

        TREVOR C. WILMOT

        *Assistant United States Attorney*